IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JAY ROBBINS,
     Plaintiff,

vs.                       Case No.: 5:18cv175/TKW/EMT

SERGEANT FOGEL, et al.,
     Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Jay Robbins ("Robbins") commenced this case by filing a civil rights complaint under 42 U.S.C. § 1983 (ECF No. 1). Defendants Daniels, Fogel, Heffel, and Jackson filed a motion for summary judgment with supporting evidentiary materials (ECF No. 33). Defendants Cywinski and Jones adopted the other Defendants' motion for summary judgment, and submitted additional supporting evidentiary materials (ECF Nos. 48, 60). Robbins filed an unsigned response in opposition to summary judgment (ECF No. 53).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Upon consideration of the parties' submissions and the relevant law, the

undersigned concludes that Defendants' motions for summary judgment should be granted.

I.    BACKGROUND

Robbins is an inmate of the Florida Department of Corrections ("FDOC"). Defendants are FDOC officials who were employed at Gulf Correctional Institution at the time of the events giving rise to this action.  They include Officer Cywinski, Sergeant Fogel, Officer Jones, Sergeant Heffel, Officer Jackson, and Captain Daniels (*see* Complaint, ECF No. 1).  Robbins claims that Defendants violated his Eighth Amendment rights by failing to protect him from harm from another inmate, Inmate Sean Hayden (*id.*).  Robbins seeks nominal and punitive damages in the amount of $15,000 (*see* Complaint; Deposition of Jay Robbins 33:8–11, Mar. 12, 2019, ECF No. 33-1).

Defendants contend they are entitled to summary judgment on the following grounds:  (1) they are entitled to qualified immunity, (2) Robbins has failed to state an Eighth Amendment violation, and (3) Robbins is not entitled to compensatory or punitive damages (*see* Defendants Fogel, Heffel, Jackson, and Daniels' Motion for Summary Judgment at 4–10, ECF No. 33; Defendant Cywinski's Motion for Summary Judgment at 1–2, 7–12, ECF No. 48; Defendant Jones' Motion for Summary Judgment at 5, ECF No. 60).

Robbins contends the evidence proves that Defendants violated his Eighth Amendment rights (Robbins' Response to Summary Judgment at 2–4, ECF No. 53).

## II.    LEGAL STANDARDS

### A.    Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his or her case or present affirmative evidence that the nonmoving party will be unable to prove his or her case at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*, 477 U.S. at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*  The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the

material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). And "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004); *see also Celotex Corp.*, 477 U.S. at 324. The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See Celotex Corp.*, *supra*; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994).

Regarding the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions**. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>    . . . .
> **(4) Affidavits or Declarations**. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).

Facts asserted in hearsay statements which are not subject to a hearsay exception, and thus would not be admissible in evidence, are insufficient to show that a fact is genuinely disputed. "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (citation omitted). If a fact cannot be presented in a form that would be admissible in evidence, it cannot be used for purposes of summary judgment. *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999); Fed. R. Civ. P. 56(c).

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment or

grant summary judgment if the moving party's motion and supporting materials—including the facts considered undisputed—show that the moving party is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2, 3).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *Jones v. Cannon*, 174 F. 3d 1271, 1282 (11th Cir. 1999).  Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove.  *See Celotex Corp.*, 477 U.S. at 317.  A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.*, 477 U.S. at 322.

### B.    Qualified Immunity

The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.  Ct. 2727, 73 L. Ed. 2d 396 (1982).  Qualified immunity protects all but the

plainly incompetent or those who knowingly violate federal law; it does not extend to one who knew or reasonably should have known that his or her actions would violate the plaintiff's federal rights. *See Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017) (citations and quotation marks omitted). The defense gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). In part, this defense recognizes the problems that government officials like correctional officers face in performing their jobs in dynamic and sometimes perilous situations. It is also designed to avoid excessive disruption of government services and to provide a direct way to end insubstantial claims early in the litigation. *See id.*

When the affirmative defense of qualified immunity is advanced, the complaint must be dismissed unless "the plaintiff's allegations state a claim of violation of clearly established law." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks and citation omitted). Absent such allegations, it is appropriate for a district court to grant the defense of qualified immunity. *See Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) ("It is . . . appropriate for a district court to grant the defense of qualified immunity at the motion to dismiss stage.").

To receive qualified immunity, a defendant must first prove that he or she was acting within the scope of his or her discretionary authority when the relevant conduct took place. *See Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). If the defendant establishes that he or she was acting within his or her discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate. *See id*.

In resolving questions of qualified immunity, courts engage in a two-pronged inquiry. *See Tolan v. Cotton*, 572 U.S. 650, 655, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014) (resolving question of qualified immunity at summary judgment stage). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right. . . . The second . . . asks whether the right in question was clearly established at the time of the violation." *Tolan*, 572 U.S. 65906 (citations, internal quotation marks, and alterations omitted) (first ellipsis in original). The court has discretion to decide which question to address first. *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

The clearly established law requirement provides government officials with the ability to anticipate what conduct will give rise to liability for a constitutional violation. *See Anderson v. Creighton*, 483 U.S. 635, 646, 107 S. Ct. 3034, 97 L. Ed.

2d 523 (1987).  To that end, when officials are acting within their discretionary capacity, they "can know that they will not be held personally liable as long as their actions are reasonable in light of current American law." *Id.*  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that **every** 'reasonable official would have understood that what he is doing violates that right.'" *Al-Kidd*, 563 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640) (emphasis added).  This imposes an objective standard, and that objective standard is "measured by reference to clearly established law." *Harlow*, 457 U.S. at 818.

Because this objective standard is fundamental to the qualified immunity defense, the district court should determine if the law was clearly established at the time the incident occurred.  As the Supreme Court explained:

> If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful . . . .  If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

*Harlow*, 457 U.S. at 818–19.  In this way, both government officials and citizens are protected.  If the law is not clearly established, then the court should dismiss the case

against the government official.  If the law was clearly established, then the claim against the government official should go forward.

Authoritative judicial decisions may "establish broad principles of law" that are clearly applicable to the conduct at issue, and it may also be obvious from "explicit statutory or constitutional statements" that certain conduct is unconstitutional.  *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1209 (11th Cir. 2007); *see also Taylor v. Barkes*, — U.S. —, 135 S. Ct. 2042, 2044, 192 L. Ed. 2d 78 (2015) ("We do not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate.").  Furthermore, recognizing that the clearly established law question turns on the law at the time of the incident, the district court must consider the law "in light of the specific context of the case, not as a broad general proposition . . . ." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).  In other words, the facts of the case before the court must be materially similar to the facts in the precedent that clearly establishes the deprivation.  *See Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015) (citation omitted).  To be clearly established, the precedent must give officials clear warning of unconstitutional conduct.  *Id.*

In considering the law to do this analysis, the district court should compare the facts of the case before it with the facts of those cases that the non-moving party

contends show the clearly established nature of the law.  As the Eleventh Circuit has explained:

> For qualified immunity purposes, a pre-existing precedent is materially similar to the circumstances facing the official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent.  Thus, every fact need not be identical. Minor variations in some facts (the precedent lacks arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different than the pre-existing precedents, leaving the law applicable—in the circumstances facing the official—not clearly established when the defendant acted.

*Merricks*, 785 F.3d at 559 (internal quotation marks omitted).

The Supreme Court recently observed:

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases.  The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial.

> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined at a high level of generality.  As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*White v. Pauly*, — U.S. —, 137 S. Ct. 548, 551–52, 196 L. Ed. 2d 463 (2017) (multiple citations, some quotation marks, and alterations omitted).

Moreover, the court cannot consider just any case law to decide if a right was clearly established. Only binding opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed, can serve as precedent for this analysis. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

And finally, because § 1983 "requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation," *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citation omitted), each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her conduct. "So [the court] must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018).

### C.    Eight Amendment Standard

"The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer v. Brennan*, 511

U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)) (alterations and quotations omitted).  "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833 (internal quotation marks and citation omitted).  Thus, it has long been recognized that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners."  *Id.* (quotation and alteration omitted).  However, "a prison custodian is not the guarantor of a prisoner's safety."  *Purcell v. Toombs Cnty.*, 400 F.3d 1313, 1321 (11th Cir. 2005) (quotation omitted).

A prison official violates the Eighth Amendment "when a substantial risk of serious harm, **of which the official is subjectively aware**, exists and the official does not respond reasonably to the risk."  *Carter v. Galloway*, 352 F.3d 1346, 1349 (internal quotation marks omitted) (alterations adopted) (emphasis added); *see also Farmer*, 511 U.S. at 828 ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment.").  The three elements of a failure-to-protect claim are (1) a substantial risk of serious harm; (2) the defendant's deliberate indifference to that risk; and (3) a causal connection

between the defendant's conduct and the Eighth Amendment violation. *See Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015).

"When examining the first element—a substantial risk of serious harm—the court uses an objective standard." *Caldwell*, 748 F.3d at 1099 (citation omitted). The alleged condition must be "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010). Further, there must be a "strong likelihood" of injury, "rather than a mere possibility," before an official's failure to act can constitute deliberate indifference. *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (quotations omitted).

The second element—deliberate indifference in the context of a failure to prevent harm—has a subjective and an objective component. *See Caldwell*, 748 F.3d at 1099. The subjective component is satisfied by evidence that the official was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference. *Rodriguez v. Sec'y for Dep't of Corrs.*, 508 F.3d 611, 617 (11th Cir. 2007) (citing *Farmer*, 511 U.S. at 837). The objective component is satisfied by evidence that the official "responded to the known risk in an unreasonable manner, in that he or she knew of ways to reduce the

harm but knowingly or recklessly declined to act." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (internal quotation marks and citation omitted).

A prisoner may advance an Eighth Amendment claim for failure to protect under two different theories, a "particularized risk" theory and/or a "dangerous conditions" theory. *See Estate of Owens v. GEO Group, Inc.*, 660 F. App'x 763, 769 (11th Cir. 2016) (unpublished but recognized as persuasive authority). Under the "particularized risk" theory, which is the theory under which Robbins asserts his Eighth Amendment claim, the prisoner may show that he was the target of a specific threat or danger, and that the defendant was subjectively aware of the individualized danger yet failed to act to alleviate that risk. *See id.* The plaintiff must adduce evidence that the defendant had subjective knowledge of the risk of serious harm to the plaintiff. *See McElligott v. Foley*, 182 F.3d 1248, 1249–50, 1255 (11th Cir. 1999).

Constructive knowledge of the risk is insufficient to establish deliberate indifference under the Eighth Amendment. So, where there are multiple defendants who, allegedly, have been deliberately indifferent, "[e]ach individual [d]efendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). The knowledge of one defendant may not be imputed to another. Further, the resulting harm may not be determinative; the

essential timeframe under analysis is restricted to the time period before the injury has occurred, when the official had knowledge of the substantial risk of harm but chose to act unreasonably.  *See Purcell*, 400 F.3d at 1320 (courts "[can]not allow the advantage of hindsight to determine whether conditions of confinement amounted to 'cruel and unusual' punishment"); *see also Brooks*, 800 F.3d at 1302 ("The very fact of an injury may, in some circumstances, be a factor in assessing that ex ante risk, but it cannot be sufficient on its own to prove that a substantial risk existed.").

A prison official may escape liability on a deliberate indifference claim if the official shows, for example, that he or she did not know of the underlying facts indicating a sufficiently substantial danger and was thus unaware of a danger, or that he or she knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.  *See Farmer*, 511 U.S. at 844.  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment" and does not give rise to a constitutional violation. *Id.* at 838.

Finally, the plaintiff must show a causal link between the officer's failure to act reasonably and the plaintiff's injury.  *Marbury*, 936 F.3d at 1233 (citation omitted).  With respect to causation, section 1983 "requires proof of an affirmative

causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation." *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993) (internal quotation marks omitted).   The constitutional deprivation must, in turn, be "a legal cause of [the plaintiff's] injuries." *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982).

## III.   MATERIAL FACTS

As this case comes before the court on Defendants' motions for summary judgment, the court is required to view the facts in the light most favorable to Robbins, the nonmoving party.  *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).   The court does so here, referring to Robbins' verified Complaint, and taking those facts from the parties' pleadings and summary judgment materials of record.  *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding that specific facts pled in a sworn complaint must be considered in opposition to summary judgment); Fed. R. Civ. P. 56(c); N.D. Fla. Loc. R. 56.1(B), (C), (F).  Matters stated below as "facts" for purposes of summary judgment may not be the actual facts.  *See Montoute v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997).

On May 1, 2018, Robbins was housed in general population with Inmate Sean Hayden (Robbins Dep. 14:7–15, Sept. 10, 2019).  Robbins and Hayden were approximately the same height and weight (Robbins Dep. 35:9–22, Sept. 10, 2019).  Robbins and Hayden had been housed together for three or four months (Robbins Dep. 14:16–18, Sept. 10, 2019).  During that time, Inmate Hayden had never hurt Robbins (Robbins Dep. 21:6–22:9, Sept. 10, 2019).  On May 1, the housing unit was on "lockdown" (i.e., inmates were not allowed to leave their cells) because someone had been stabbed that day (Robbins Dep. 22:15–17, 29:5–15, Sept. 10, 2019).  Inmate Hayden was mad at Robbins, because Robbins "picked up one of his [Hayden's] K2 roaches and got high off of it in front of him" (Robbins Dep. 19:6–8, Sept. 10, 2019).  Robbins was on the top bunk, and Hayden started punching him "real hard" on his right side every 15–20 minutes (Robbins Dep. 19:8–11, Sept. 10, 2019).  According to Robbins, Inmate Hayden was punching him because Hayden owed gang members money for "front[ing] him some dope" (Robbins Dep. 26:4–11, Sept. 10, 2019).  The day prior to May 1, two gang members came to Hayden and Robbins' cell and told Hayden, in Robbins' presence, that they would "cut him [Hayden] up" if Hayden did not pay them for drugs they had "fronted" him (Robbins Dep. 26:7–9, 27:2–6, 29:16–30:5, Sept. 10, 2019).  According to Robbins, Inmate Hayden wanted to "check in" to protective custody to avoid harm from the gang

members (Robbins Dep. 26:9–11, 26:24–27:2, 28:11–21, Sept. 10, 2019). Hayden intended to accomplish this by going to confinement for punching Robbins and also by declaring a "psychological emergency" (*id.*). According to Robbins, Hayden told him that he (Hayden) was going to stab him (Robbins) with his homemade knife/"shank" (Robbins Dep. 28:6–8, Sept. 10, 2019). Robbins knew that Hayden had a homemade knife/shank and a Bic razor, but Robbins also knew that Hayden would not use either of those items to harm him, because Hayden did not want his razor confiscated or to "get a charge" for having the shank (Robbins Dep. 41:22–42:1, 42:16–22, 45:4–12, Sept. 10, 2019).

Back to May 1, Robbins did not attempt to notify anyone that Inmate Hayden was punching him (Robbins Dep. 30:22–24, Sept. 10, 2019). Approximately an hour after Hayden began punching Robbins, Defendant Officer Cywinski came to the cell to conduct master roster count, at approximately 9:00–10:00 p.m. (Robbins Dep. 19:12–13, 30:16–21, Sept. 10, 2019). Inmate Hayden told Officer Cywinski that if Robbins was not removed from the cell, he (Hayden) was "going to hurt" Robbins and "cause some great bodily harm" (Robbins Dep. 19:14–17, 24:22–25:10, Sept. 10, 2019). Hayden then punched Robbins in the ribs in Cywinski's presence

(Complaint at 7).[1]  Officer Cywinski told Inmate Hayden that Robbins would have

to come to the cell door and speak to her himself (Robbins Dep. 25:10–12, Sept. 10,

2019).  Inmate Hayden told Robbins to get down off his bunk and tell Cywinski he

wanted to check into protective custody because he feared for his life (Robbins Dep.

25:13–16, Sept. 10, 2019).  Robbins got of the bunk, went to the cell door, and told

Cywinski he was "in fear for my life" and that Hayden had been hitting him for an

hour and would "cause him great bodily harm" if Cywinski did not "get ahold of

somebody" to remove him (Robbins) from the cell (Complaint at 7–8; Robbins Dep.

28:4–6, 31:8–11, Sept. 10, 2019; Robbins Dep. 16:7–9, Mar. 12, 2019).  Officer

Cywinski responded by asking Robbins if he was sure he wanted to "do this"

(Robbins Dep. 16:9–10, Mar. 12, 2019).  Robbins repeated he wanted to be placed

in protective custody because he was "in fear for my life" and that Hayden was

"really going to hurt me" (Robbins Dep. 16:10–13, Mar. 12, 2019).  Officer

Cywinski did not have unilateral authority to move Robbins from the cell

(Declaration of Gena Cywinski ¶ 4, ECF No. 48-3).  Cywinski communicated to

other officers through her radio, and told Robbins that his request would have to wait

until after master roster count (Robbins Dep. 16:12–17:1, Mar. 12, 2019).  Since it

---

[1] References to Robbins' Complaint are to the page numbers automatically assigned by the court's electronic filing system, rather than the page numbers Robbins assigned.

appeared to Inmate Hayden that "beating up" Robbins would not accomplish Hayden's goal of getting himself out of the cell, Hayden used a different "ploy" to try to get out of the cell (Robbins Dep. 39:16–40:7, Sept. 10, 2019). Hayden told Officer Cywinski he wanted to declare a "psychological emergency," but Cywinski "wasn't buying it" (Robbins Dep. 39:16–40:7, Sept. 10, 2019).

Officer Cywinski walked away from the cell, and Robbins began screaming for officers (Complaint at 8). Defendant Sergeant Fogel and Defendant Officer Jones responded to the cell and asked what the problem was (Robbins Dep. 16:7–17:1, Mar. 12, 2019; Robbins Dep. 31:24–32:4, Sept. 10, 2019). By that time, Inmate Hayden had "lightened up a bit" on punching Robbins (Robbins Dep. 17:2–8, Mar. 12, 2019). Robbins told Sergeant Fogel he was "in fear for my life," that Hayden had been hitting him, and that he wanted to "check in" to protective custody (Complaint at 8; Robbins Dep. 33:5–6, Sept. 10, 2019). Robbins did not have any visible injuries (Robbins Dep. 18:25–19:3, Mar. 12, 2019). Inmate Hayden told Sergeant Fogel he wanted to "check in" to protective custody for a psychological emergency (Complaint at 8). Neither Robbins nor Hayden spoke directly with Officer Jones, but Jones was present when Robbins and Hayden spoke to Sergeant Fogel (Robbins Dep. 17:16–19, 17:25–18:5, 32:7–15, Sept. 10, 2019). Sergeant Fogel told Robbins to fend for himself, and that he (Robbins) and Hayden should

"handle their business like men" (Complaint at 8; Robbins Dep. 33:16–18, Sept. 10, 2019).  After Sergeant Fogel and Officer Jones left, Inmate Hayden continued to punch Robbins "for a little while" and then went to sleep (Robbins Dep. 19:9–10, 19:25–20:1, Mar. 12, 2019).

The dormitory was still on lockdown the following morning (Robbins Dep. 37:19–21, Sept. 10, 2019).  Officers delivered breakfast trays by 8:00 a.m. (in Robbins' Complaint he alleged breakfast was delivered at 7:00–8:00 a.m., but in his deposition he stated it was delivered at 5:00–6:00 a.m.) (Complaint at 9; Robbins Dep. 36:3–7, Sept. 10, 2019).  Robbins and Inmate Hayden ate breakfast and then "laid back down" (Complaint at 9).

Two hours later, at approximately 10:00 a.m., Hayden punched Robbins in the body and the back of the head as Robbins lay on his bunk facing the wall (Complaint at 9; Robbins Dep. 37:25–38:3, Sept. 10, 2019).  Robbins told Inmate Hayden he knew of a way to get them both out of the cell, and he told Hayden to give him a metal screw from the window so he could cut himself with it (Robbins Dep. 41:12–14, 42:24–43:1, Sept. 10, 2019).  Robbins then yelled for officers to come to the cell (Complaint at 9; Robbins Dep. 44:17–23, Sept. 10, 2019).  Defendant Officer Jackson and Defendant Sergeant Heffel came to the cell door and asked what the problem was (Complaint at 9; Robbins Dep. 44:19–20, Sept. 10,

2019).   Inmate Hayden told the officers that "something bad" would happen to Robbins if they did not remove Robbins from the cell (Complaint at 9).   Hayden also stated he wanted to "check in" for a psychological emergency (*id.*).   Robbins told Sergeant Heffel and Officer Jackson that he was "in fear for his life" and wanted to "check in" to protective custody (*id.*).   Sergeant Heffel and Officer Jackson continued with master roster count, walked away, and then returned "a little while later" with Defendant Captain Daniels and two other officers (Complaint at 9; Robbins Dep. 45:25–46:1, 46:5–6, 12–19, Sept. 10, 2019).   Robbins told Captain Daniels "what had been happening" and that officers had refused his requests for protective custody (*id.*).   Captain Daniels asked Robbins "if it could wait until after count" (*id.*).   Robbins responded that it could not wait because he feared for his life (*id.*).   Captain Daniels responded, "Well, you guys are going to have to wait 'til after count, so we can deal with this.   Make sure it's not a lover's quarrel." (Robbins Dep. 45:25–46:3, Sept. 10, 2019).   Robbins "begged" Captain Daniels for "immediate help" and reiterated that the situation could not wait (Complaint at 9).   Captain Daniels responded, "Tough luck," and said it would have to wait (*id.*).

As soon as Captain Daniels walked away, Robbins cut his left wrist with the metal screw (Robbins Dep. 45:14–21, 46:24–47:6, Sept. 10, 2019).   Inmate Hayden yelled to the officers that Robbins cut his wrist and was bleeding (Robbins Dep.

46:6–11, Sept. 10, 2019). Captain Daniels, Sergeant Heffel, and Officer Jackson returned to the cell, removed Robbins and Inmate Hayden, and took them both to the medical department (Robbins Dep. 47:6–12, Sept. 10, 2019).

Robbins told the officers he did not want to declare a psychological emergency and only wanted medical attention (Robbins Dep. 47:16–19, Sept. 10, 2019). An officer photographed Robbins' right side and left wrist (Robbins Dep. 47:24–48:3, Sept. 10, 2019). The cut on Robbins' wrist was not bleeding badly (Robbins Dep. 48:9–12, Sept. 10, 2019).

LPN Ashley examined Robbins at 11:50 a.m. that morning (May 2, 2018) (FDOC Emergency Room Record, ECF No. 48-2). LPN Ashley noted swelling on the right chest/abdomen, swelling of the right ankle, and a superficial laceration on the left forearm (Emergency Room Record; Declaration of Dr. Timothy Whalen ¶ 2, ECF No. 33-2). The swelling was deemed to be minor without the need of x-rays to determine any fracture (Whalen Decl. ¶ 2). The laceration was deemed superficial because LPN Ashley easily cleaned it and no sutures were needed (*id.*). LPN Ashley also provided Robbins with Tylenol for pain (Emergency Room Record). The injuries documented in Robbins' medical records are consistent with his allegations that he was punched on the right side of his body and scratched himself with a screw (Declaration of Dr. Timothy Whalen ¶ 2, ECF No. 33-2). According to Robbins,

three or four days later (i.e., on May 5 or 6), prominent bruises appeared on his right side extending from his rib cage to his ankle (Robbins Dep. 17:14–20, Mar. 12, 2019).  Robbins refused a follow-up nursing visit on May 13, 2019 (*id.*).

Robbins received a mental health examination the day of the incident (May 2, 2018), which revealed he had only mild to moderate stress signs which could be monitored on an outpatient basis (Whalen Decl. ¶ 2).  Robbins states he began suffering nightmares involving blood and knives after the incident (Robbins Dep. 49:15–22, 50:7–8, Sept. 10, 2019).

## IV.    DISCUSSION

In determining the threshold issue of whether an employee acted within his discretionary authority, the Eleventh Circuit engages in a "two-fold" inquiry.  *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (internal quotation marks and citation omitted).  At the first step, the court asks "whether the government employee was . . . performing a legitimate job-related function (that is, pursuing a job-related goal)."  *Id.*  "Put another way, to pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description."  *Id.*  At the second

step, the court asks whether the government employee was performing the job-related function "through means that were within his power to utilize." *Id.*

Here, Robbins does not dispute that Defendants were acting within the scope of their discretionary authority as FDOC correctional officers when the alleged constitutional violation occurred.  Further, Defendants have shown objective circumstances which compel the conclusion that their actions were undertaken pursuant to the performance of their duties and within the scope of their authority. The undisputed facts show that at the time of each Defendant's interaction with Robbins, he or she was performing a function within his or her job description as a correctional officer.  Additionally, each Defendant was performing his or her function through means within his or her power to utilize.  Therefore, the court is satisfied that each Defendant's actions were within the scope of his or her discretionary authority.

The burden thus shifts to Robbins to show that qualified immunity is not appropriate.  Defendants concede that Robbins has shown a genuine issue of material fact with respect to the first element of an Eighth Amendment claim, i.e., that objectively speaking, Inmate Hayden posed a substantial risk of serious harm to

Robbins (*see* ECF No. 48 at 8–9).[2]  Defendants contend Robbins has failed to show

a genuine issue of material fact as to the second element, i.e., that any Defendant

exhibited deliberate indifference (*see* ECF No. 33 at 5–8; ECF No. 48 at 9–11; ECF

No. 60 at 5).  Defendants also assert they are entitled to qualified immunity (*see* ECF

No. 33 at 4–5; ECF No. 48 at 1–2; ECF No. 60 at 5).

In Robbins' response, he contends the evidence shows that Defendants were

deliberately indifferent to his safety by failing to immediately separate him from

Inmate Hayden, under caselaw that existed at the time of the incident, i.e., May of

2018 (*see* ECF No. 53).  Robbins cites several cases in support of his argument, but

only one of them qualifies as clearly established law for purposes of qualified

immunity analysis, specifically, *Farmer v. Brennan*, 511 U.S. 825 (1994) (*see id.*).[3]

As previously discussed, the Supreme Court's decision in *Farmer* held that

the proper test for deliberate indifference, in the context of an Eighth Amendment

failure-to-protect claim, is the following:

> a prison official cannot be found liable under the Eighth Amendment
> for denying an inmate humane conditions of confinement unless the
> official knows of and disregards an excessive risk to inmate health or
> safety; the official must both be aware of facts from which the inference

---

[2] To be clear, Robbins admits that the only harm he actually feared was Hayden's continuing to punch him.  Robbins admits he did not truly fear that Hayden would harm him with either the shank or the razor.

[3] The other decisions Robbins cited were issued by the Eighth and Tenth Circuits and the Southern District of New York (*see* ECF No. 53 at 3).

could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

511 U.S. at 837. *Farmer* involved a transsexual prisoner who claimed that prison officials showed deliberate indifference to his safety from harm from other inmates by placing him in the general prison population. The Supreme Court vacated the district court's grant of summary judgment in favor of the prison officials and remanded for further proceedings, because the district court "may have mistakenly thought" that the plaintiff was required to provide a defendant with advance notification of a risk of harm. *Id.* at 849. The Court noted that advance notification was not a necessary element of a failure-to-protect claim, and that subjective knowledge may be inferred from other evidence in the summary judgment record, such as (1) prison officials' admission that Farmer was a "non-violent" transsexual who, because of his "youth and feminine appearance," was "likely to experience a great deal of sexual pressure" in prison; and (2) a defendant's statement to Farmer that there was "a high probability" Farmer "could not safely function" at the prison. *Id.*

As previously noted, *Farmer* is the only controlling case cited by Robbins. Although the court is not required to conduct Robbins' legal research for him, the court will summarize other cases which comprise the governing law as it existed on May 1–2, 2018.

In the Eleventh Circuit's 2016 decision in *Bowen v. Warden, Baldwin State Prison*, 826 F.3d 1312 (11th Cir. 2016), the court held that the defendants' total failure to investigate or take any other action to mitigate the substantial risk of serious harm that Bowen's cellmate posed to Bowen was unconstitutional where the facts showed that the defendants knew the following:  (1) the cellmate had been convicted of murder; (2) the cellmate was a severe paranoid schizophrenic who suffered from auditory hallucinations and violent delusions involving his cellmates; (3) the cellmate could become impulsive and dangerous if his mental condition decompensated; (4) the cellmate was designated by the prison as a Level III mental health inmate, meaning he exhibited "a tenuous mental status that is easily overwhelmed by everyday pressures, demands and frustrations resulting in . . . impulsive behavior, poor judgment, a deterioration of emotional controls, loosening of associations, delusional thinking and/or hallucinations"; (5) the cellmate had been transferred to the segregation unit for assaulting his previous cellmate; (6) the prison's "Placement Guideline[s]" required mental health inmates who had committed an assault to be housed alone; (7) Bowen was being housed in the cell with the cellmate in contradiction to the Guidelines' requirement; (8) the cellmate was significantly larger than Bowen; and (9) the cell the two inmates shared was

small, was not observable from the outside unless the window flap was lifted, and was not equipped with an alarm. *Id.* at 1321–25.

In the Eleventh Circuit's 2014 decision in *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014), the court held that the defendants' total failure to make any attempt, or take any action, to minimize the substantial risk of serious harm that Caldwell's cellmate posed to him was unconstitutional where the facts showed that the defendants knew the following:

> • During his incarceration at another federal prison, [the cellmate] was very disruptive and had a violent past that resulted in his placement in the SMU [Special Management Unit]. [The cellmate] required greater prison management at the SMU to ensure the safety, security, and orderly operation of federal prisons.
>
> • On the morning of September 9, 2009, while [the cellmate] and plaintiff Caldwell were locked in their shared cell, [the cellmate] started a fire in the cell. Caldwell played no part in starting that fire, and [the cellmate] quickly and freely claimed full responsibility for starting the fire.
>
> • [The cellmate] used Caldwell's personal photographs and papers when starting the fire.
>
> • While the inmates remained in the locked cell, the fire filled the cell with flames and black smoke. Although the fire was concentrated at the door, it had also spread to (or from) the cell's light fixture, sink, and plaintiff Caldwell's personal property.
>
> • The fire was so severe that the flames and firefighting efforts destroyed a large amount of Caldwell's personal property, including his personal photographs, address book, and legal materials.

• After being rescued from his locked, fiery cell, plaintiff Caldwell needed a medical examination to assess his injuries.

• The cell fire threatened plaintiff Caldwell's and [the cellmate's] lives and/or safety.

• After the fire but before he was returned his cell, plaintiff Caldwell told each defendant that he feared that his life would be in danger if he was returned to the cell with [the cellmate]. . . . [O]n September 10 . . ., the morning after the fire, . . . [the cellmate] placed Caldwell in a choke-hold until Caldwell passed out. When Caldwell regained consciousness, he discovered that he was on the floor and that his hands and feet were bound with fabric. Caldwell was bleeding from his nose and from a gash on his head. [His cellmate] held an 8.5 shank, with a handle made from cloth, and yelled through the cell door that he was going to kill Caldwell. . . . Caldwell had puncture wounds and cuts on his head and chest; contusions on his scalp, forehead, nose, cheek, and neck; lacerations on his chest; and abrasions to his wrists, ankles, left knee, and right shin.

• Following [the cellmate's] attack on plaintiff Caldwell, Captain Smith [Smith was not a named Defendant] stated in a report that [the cellmate] "was very disruptive" and had "an extensive well documented history of disruptive and assaultive behavior" that was having "a major impact on the orderly running of the Institution as well as the safety of both Staff and inmates."

748 F.3d at 1100–01.

In the Eleventh Circuit's 2007 decision in *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611 (11th Cir. 2007), the plaintiff had been segregated from the general prison population for security purposes, during which time he received (and reported to prison authorities) specific death threats from members of his former gang who were prisoners in the general population. *Id.* at 613–15. Rodriguez'

requests for a transfer to another facility were denied.  Within hours of his release into the general prison population, a member of his former gang stabbed him in the chest and back.  *Id.* at 615–16.  The Eleventh Circuit found that "the gang-related threats made on Rodriguez' life, which were explicitly reported to prison officials, present[ed] a substantial enough risk of harm to trigger a prison official's Eighth Amendment duty to act."  *Id.* at 617 n. 12.

In the Eleventh Circuit's 2003 decision in *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003), the court "held that the total failure to monitor or supervise a visibly violent, mentally unstable, schizophrenic inmate who was housed in a separate unit for mentally ill inmates and who posed a substantial risk of serious harm to other inmates in that housing unit constituted deliberate indifference" in violation of the Eighth Amendment.  *Id.* at 1358–59.[4]

---

[4] In *Carter v. Galloway*, 352 F.3d 1346 (11th Cir. 2003), the Eleventh Circuit held that the plaintiff failed to establish that defendants had a subjective awareness of a substantial risk of serious physical threat to him from his cellmate, where prison officials knew that the cellmate was a "problem inmate" with a well-documented history of prison disobedience and had been prone to violence, and the plaintiff had complained that the cellmate was acting crazy, roaming his cell like a "caged animal," wanting to fake a hanging, and telling plaintiff he would help in the fake hanging "one way or another;" but the plaintiff never told any defendant he feared his cellmate or that his cellmate had clearly threatened him.  352 F.3d at 1349–50.  The court **noted in *dictum*** that a plaintiff's telling prison officials he feared his would-be attacker, telling defendants that his would-be attacker clearly threatened him, and requesting placement in protective custody **may** provide a sufficient basis to satisfy the subjective component of the deliberate indifferent standard, *see* 352 F.3d at 1349–50.  However, ***dicta*** are not clearly established law for purposes of qualified immunity analysis.  *See Denno v. School Bd. Of Volusia Cnty., Fla.*, 218 F.3d 1267, 1280 (11th Cir. 2000) ("It is well established in this circuit, however, that *dicta* are of no assistance in determining whether or not law is clearly established for the purpose of qualified immunity.")

Against this legal backdrop, the court will judge each individual Defendant's conduct on the basis of what that person knew. *See Burnette*, 533 F.3d at 1331.

## A.  Individual Capacity Claim Against Officer Cywinski

Officer Cywinski knew that Robbins did not mention to her any problems with Inmate Hayden when she initially stopped at their cell, and that Robbins did so only after Inmate Hayden told Robbins to get off his bunk and tell Cywinski he "feared for his life," and Inmate Hayden punched Robbins as he lay on his bunk.  Robbins then followed Hayden's lead by getting off his bunk, repeating what Hayden told him to say, and repeating what he heard Hayden say to Cywinski (i.e., that Hayden would "cause great bodily harm").  Robbins also told Officer Cywinski that Hayden had been hitting him for an hour.

Officer Cywinski obviously perceived a need for further investigation into whether Robbins was truly at risk of any harm from Hayden, as evidenced by the fact that she communicated with other officers on her radio.  But this evidence does not remotely suggest that Cywinski actually believed, knew, or even suspected that Inmate Hayden **posed a substantial risk of serious harm** to Robbins.  And even if the evidence was enough to show a genuine issue of material fact as to Officer

(citing *Jones v. Cannon*, 174 F.3d 1271, 1288 n.11 (11th Cir. 1999), and *Hamilton v. Cannon*, 80 F.3d 1525, 1530 (11th Cir. 1996)).

Cywinski's knowledge of a substantial risk of serious harm, Cywinski—who did *not* have unilateral authority to move Robbins from the cell—responded to the risk in an objectively reasonable manner by communicating with other officers and informing Robbins that his request would be addressed after master roster count.

Robbins has not demonstrated a genuine factual issue as to whether Officer Cywinski was deliberately indifferent to a substantial risk of serious harm to Robbins. Therefore, Defendant Cywinski is entitled to qualified immunity with respect to Robbins' individual capacity claim.

### B.   Individual Capacity Claims Against Sergeant Fogel and Officer Jones

After Officer Cywinski left the cell-front on the night of May 1, Sergeant Fogel and Officer Jones responded to Robbins' cell. Sergeant Fogel asked what the problem was, and Robbins responded that he was "in fear for my life," that Inmate Hayden had been hitting him, and that he (Robbins) wanted to "check in" to protective. Robbins did not have any visible injuries. Inmate Hayden stated he wanted to "check in" to protective custody for a psychological emergency.

These facts are materially different than the facts of *Farmer*, *Bowen* and *Cottone*, discussed *supra*. And although there is one fact in common with *Rodriguez* and *Caldwell*, specifically, the plaintiff (Robbins) complained to defendants (Fogel and Jones) that he feared for his life, this case is materially distinguishable from both

*Rodriguez* and *Caldwell*, because the severity of harm communicated by the plaintiffs in *Rodriguez* and *Caldwell* and the circumstances surrounding their complaints were materially different than in this case.  In *Rodriguez*, the plaintiff told the defendant on at least two occasions that members of his former gang had threatened to kill him.  508 F.3d at 618.  In *Caldwell,* there was evidence that the threatening inmate had a past of disruptive and violent behavior, and the inmate had endangered his and the plaintiff's lives by setting a dangerous fire in their cell prior to the plaintiff's reporting to each defendant that he feared for his life.  748 F.3d 1100–01.

Here, there is no evidence that Inmate Hayden had a propensity for violence, and Robbins admits there was no previous history of violence between the two of them, either as cellmates or otherwise.  Further, there is no evidence that Sergeant Fogel or Officer Jones knew that Inmate Hayden had a motivation for harming Robbins (unlike *Rodriguez*, where the defendant officer knew of the gang affiliation).  Although Robbins told Sergeant Fogel, in Officer Jones' presence, that Inmate Hayden had been hitting/punching him, Robbins did not request medical attention, and he did not have any visible injuries.  And although Inmate Hayden told Sergeant Fogel he wanted to be removed from the cell for a "psychological

emergency," he did not indicate his "psychological emergency" was related to or may affect Robbins.

Viewing the evidence in the light most favorable to Robbins, he has failed to demonstrate a genuine issue of material fact as to whether Sergeant Fogel or Officer Jones was subjectively aware that Robbins faced a substantial risk of serious harm from Inmate Hayden if Robbins was not immediately removed from the cell. Therefore, Robbins has not shown he could withstand a directed verdict on the subjective component of the deliberate indifference standard. And even there was enough evidence to create a genuine issue of material fact as to the subjective component of the deliberate indifference standard, Robbins has not carried his burden of showing that Sergeant Fogel or Officer Jones had fair warning that their failure to immediately remove Robbins violated his constitutional rights. Therefore, Defendants Fogel and Jones are entitled to qualified immunity with respect to Robbins' individual capacity claims.

### C.    Individual Capacity Claims against Captain Daniels, Sergeant Heffel, and Officer Jackson

Robbins did not report any problem with Inmate Hayden from 11:00 p.m. on May 1, 2018, to 10:00 a.m. the next morning, even though he had an opportunity to do so when officers delivered breakfast to the cell earlier that morning. At approximately 10:00 a.m., Robbins yelled for officers to come to the cell. Sergeant

Heffel and Officer Jackson responded to Robbins' cell and asked what the problem was.  Robbins told them he was "in fear for his life" and wanted to "check in" to protective custody.  Inmate Hayden told the officers he wanted to "check in" for a psychological emergency and that "something bad" would happen to Robbins. Sergeant Heffel and Officer Jackson continued with count procedure, contacted Captain Daniels, and then returned to Robbins' cell "a little while later" with Captain Daniels and two other officers.  Robbins told Captain Daniels "what had been happening," and that officers had refused his request for protective custody.  Captain Daniels asked if the situation could wait until after count, and Robbins responded that he was "in fear for his life" and "begged" Daniels for "immediate help."

No reasonable juror could infer, from Robbins' and Hayden's generalized statements alone (which is the only evidence of subjective knowledge on the part of Jackson, Heffel, or Daniels), that any of the officers subjectively knew that their failure to **immediately** remove Robbins from the cell, as opposed to waiting until after count, placed Robbins at substantial risk of serious physical harm from Inmate Hayden.  And even there was enough evidence to create a genuine issue of material fact as to the subjective component of the deliberate indifference standard, Robbins has not carried his burden of showing that Captain Daniels, Sergeant Heffel, or Officer Jackson had fair warning that their waiting until after count violated

Robbins' constitutional rights.  Therefore, Defendants Jackson, Heffel, and Daniels are entitled to qualified immunity with respect to Robbins' individual capacity claims.

### D.    Official Capacity Claims

As a final matter, Robbins does not specify whether he is suing Defendants in their individual capacities or official capacities or both.  To the extent he asserts claims against Defendants in their official capacities, his claims are barred by the Eleventh Amendment.  *See Miller v. King*, 384 F.3d 1248 (11th Cir. 2004) (a plaintiff may not bring a § 1983 action for monetary damages against the state or state officials in their official capacities).  Absent waiver or express congressional abrogation, the Eleventh Amendment prohibits a suit brought by a private individual against a state in federal court.  *See Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765–78, 122 S. Ct. 1864, 152 L. Ed. 2d 962 (2002); *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); *Gamble v. Fla. Dep't of Health and Rehab., Serv.*, 779 F.2d 1509, 1511 (11th Cir. 1986). A suit against a state employee in his official capacity is deemed to be a suit against the state for Eleventh Amendment purposes.  *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).  Therefore, Defendants are

entitled to judgment in their favor on Robbins' official capacity claims, to the extent

Robbins asserts them.

V.    CONCLUSION

There is no genuine issue of material fact for trial, and considering the material

facts in the light most favorable to Robbins, none of the Defendants exhibited

deliberate indifference to a substantial risk of serious harm to Robbins.  Additionally,

clearly established case law on May 1–2, 2018, did provide any Defendant with fair

warning that his or her conduct violated Robbins' Eighth Amendment rights.

Therefore, Defendants are entitled to qualified immunity with respect to Robbins'

claims against them in their individual capacities.   Robbins' claims against

Defendants in their official capacities, to the extent he asserts them, are barred by

the Eleventh Amendment.  Therefore, Defendants are entitled to judgment in their

favor.

Accordingly, it is respectfully **RECOMMENDED**:

That Defendants' motions for summary judgment (ECF Nos. 33, 48, 60) be

**GRANTED**, and judgment be entered in favor of Defendants and against Plaintiff.

At Pensacola, Florida this 7th day of January 2020.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections must be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.